**Abigail Noel FISHER and Rachel Multer Michalewicz, Plaintiffs,**

v.

**UNIVERSITY OF TEXAS AT AUSTIN, et al., Defendants.**

No. A–08–CA–263–SS.

United States District Court, W.D. Texas, Austin Division.

Aug. 17, 2009.

Bert W. Rein (argued), Thomas R. McCarthy, Suzzette Rodriguez Hurley, Wiley Rein LLP, Washington, DC, Paul M. Terrill, Joshua Katz, The Terrill Firm, P.C., Austin, TX, for Plaintiffs.

James C. Ho, Solicitor General (argued), Joseph D. Hughes, Assistant Solicitor General, Mishell B. Kneeland, Assistant Attorney General, Austin, TX, for Defendants.

### ORDER

SAM SPARKS, District Judge.

BE IT REMEMBERED on June 12, 2009 the Court called the above-styled cause for a hearing on all pending matters, the parties appeared through counsel, and the Court addressed Plaintiffs' Motion for Partial Summary Judgment [# 94], Defendants' Cross–Motion for Summary Judgment [# 96], Plaintiffs' Combined Reply Memorandum in Support of Motion for Partial Summary Judgment and Memorandum in Opposition to Defendants' Cross–Motion for Partial Summary Judgment ("Plaintiffs' Reply and Resp.") [# 98, 99], Defendants' Reply memorandum in Support of Cross–Motion for Summary Judgment [# 102], *Amicus Curiae* Lawrence Longoria, Jr., Nathan Bunch, and Texas League of United Latin American Citizens' (hereinafter collectively referred to as "LULAC") Motion for Leave to File *Amicus Curiae* Brief In Support of Defendants Out of Time [# 104], and Plaintiffs' Response to LULAC's Motion for Leave [# 107]. Plaintiffs do not object to LULAC's participation as *amici,* thus LULAC's Motion for Leave to File *Amicus Curiae* Brief In Support of Defendants Out of Time [# 104] is GRANTED; however, Plaintiffs' objection to the new evidence submitted in support of LULAC's brief is well taken. The Court will sustain the objection and thus consider only LULAC's legal arguments and arguments based on the properly-submitted evidence in this case, and will not consider the new evidence submitted by LULAC. Also filed in relation to the cross motions for summary judgment and considered by the Court are LULAC's *Amicus Curiae* Brief in Support of Defendants [# 104] and *Amicus Curiae* NAACP Legal Defense & Educational Fund, Inc., The Black Student Alliance at the University of Texas at Austin, Chad Stanton, Anthony Williams, Ariel Barrett, C.J. Davis, Devon Robinson, Trenton Stanton, and Eric Stanton's (hereinafter collectively referred to as "NAACP") *Amicus Curiae* Memorandum in Support of Defendants' Cross–Motion for Summary Judgment and In Opposition to Plaintiffs' Motion for Partial Summary Judgment [# 103]. After considering the motions, the responses, the replies, the *amicus* briefs, the relevant law, and the

case file as a whole, the Court enters the following opinion and orders.

## BACKGROUND

### I. Procedural History

On April 7, 2008, Plaintiff Abigail Fisher filed suit in the Western District of Texas. On April 17, 2008, Ms. Fisher was joined in her suit by Rachel Michalewicz. Plaintiff Fisher is a Caucasian female who attended Stephen F. Austin High School in Sugar Land, Texas. Plaintiff Michalewicz is a Caucasian female who attended Jack C. Hays High School in Buda, Texas. Plaintiffs both applied for admission to the University of Texas at Austin ("UT" or the "University") in the fall of 2008. Both were rejected.[1] Plaintiffs sued multiple defendants: the State of Texas; UT; Mark G. Yudof, Chancellor of the University of Texas System in his official capacity; David B. Pryor, Executive Vice Chancellor for Academic Affairs in his official capacity; Barry D. Burgdorf, Vice Chancellor and General Counsel in his official capacity; William Powers, Jr., President of the University of Texas at Austin in his official capacity; the Board of Regents of the Texas State University System; John W. Barnhill, Jr., H. Scott Caven, Jr., James R. Huffines, Janiece Longoria, Colleen McHugh, Robert B. Rowling, James D. Dannenbaum, Paul Foster, and Printice L. Gary, as Members of the Board of Regents in their official capacities; and Bruce Walker, Vice Provost and Director of Undergraduate Admissions in his official capacity (collectively "Defendants").[2] Plaintiffs contend the "admissions policies and procedures currently applied by Defendants discriminate against Plaintiffs on the basis of their race in violation of their right to equal protection of the laws under the Fourteenth Amendment of the United States Constitution, U.S. Const. amend. XIV, § 1, and federal civil rights statutes, 42 U.S.C. §§ 1981, 1983, and 2000d *et seq.*" Pls.' Am. Compl. [# 30] ¶ 2. Plaintiffs seek declaratory and injunctive relief, including evaluation of Plaintiffs' applications for admission under race-neutral criteria, and attorneys' fees and costs.

Following the Court's denial of Plaintiffs' motion for preliminary injunction, the parties agreed to a scheduling order bifurcating the trial into two phases: liability and remedy. The Court permitted two groups, LULAC and NAACP, to submit *amici* briefs in lieu of intervention. On June 12, 2009, the Court held a hearing on the parties' motions for summary judgment regarding liability, specifically on the issue of whether UT's admissions policies and practices violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

### II. History of Undergraduate Admissions at the University of Texas at Austin

The University of Texas at Austin ("UT") is a public education institution authorized by Article VII § 10 of the Texas Constitution and funded by the governments of Texas and the United States. Pls.' Second Am. Compl. [# 85] ¶ 18. It is a highly selective university, receiving applications from approximately four times more students each year than it can enroll in its freshman class. Defs.' Cross–Mot. for Summ. J. Statement of Facts ¶ 2. For the entering class of 2008, to which Plaintiffs sought admission, 29,501 students applied to UT. Less than half, 12,843, were admitted and 6,715 ultimately enrolled. Defs.' Cross–Mot. for Summ. J. Tab 8, Aff.

---

1. However, as Texas residents both Plaintiffs were offered the opportunity to participate in UT's Coordinated Admission Program ("CAP"), described more fully below.

2. Plaintiffs subsequently voluntarily dismissed Defendants the State of Texas and Burgdorf, and substituted Kenneth Shine for Mark Yudof.

of Gary M. Lavergne ("Lavergne Aff.") Ex. C, *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at the University of Texas at Austin,* October 28, 2008 at 6 (Table 1) ("*2008 Top Ten Report* "). As the flagship university of Texas, UT describes its admissions goal as enrolling a meritorious and diverse student body with the expectation that many of its graduates will become state and national leaders. Defs.' Cross–Mot. for Summ. J. Tab 11, Affidavit of N. Bruce Walker ("Walker Aff.") Ex. A, *Proposal to Consider Race and Ethnicity in Admissions,* June 25, 2004 at 24–25 ("*2004 Proposal*"); Defs.' Cross–Mot. for Summ. J. Tab 5, Dep. of N. Bruce Walker ("Walker Dep.") at 9:10–12. To accomplish this, the University continuously develops internal procedures to supplement the judicial and legislative mandates governing its admissions process. Defs.' Cross–Mot. for Summ. J. Tab 2, Dep. of Kendra Ishop ("Ishop Dep.") at 9:13–18. The complex system currently in use at UT and challenged by the Plaintiffs is the product of these shifting internal and external policies. *Id.* In order to provide context to the current system, the Court will briefly review the changes in UT's admissions process from 1995 to today.

### a. UT Admissions Pre- and Post-*Hopwood v. Texas*

Until 1996, UT admitted students based on a two-tiered affirmative action system. Pls.' Mot. for Part. Summ. J. Mem. at 3. The first element, still in use today, is known as a the Academic Index ("AI"), and is a computation of each applicant's predicted freshman grade point average ("PGPA") based on the student's high school class rank and standardized test scores (SAT or ACT). *Id.* The second element considered prior to the Fifth Circuit's decision in *Hopwood v. Texas,* 78 F.3d 932 (5th Cir.1996), was the applicant's race, as UT believed exclusive reliance on

PGPA would yield a class with "unacceptably low diversity levels." Lavergne Aff. Ex. A, *Implementation and Results of the Texas Automatic Admissions Law (HB 588) at The University of Texas at Austin,* December 2006 (revised December 2007) at 2 ("*2006 Top Ten Report* "). As a result of this system, UT's 1996 enrolled freshman class, the last class admitted using this process, included 4.1 percent African-American student enrollment and 14.7 percent Hispanic student enrollment. Pls.' Mot. for Part. Summ. J. Statement of Facts ¶ 13 (citing *2006 Top Ten Report* at 4–5 (Tables 1, 1a)).

The Fifth Circuit terminated this system with its decision in *Hopwood v. Texas,* holding unconstitutional the use of race-based criteria in admissions decisions at The University of Texas School of Law. 78 F.3d at 957. The Court concluded diversity in education does not constitute a compelling governmental interest, a conclusion the Texas Attorney General interpreted as prohibiting the use of race as a factor in admissions by any undergraduate or graduate program at Texas state universities, including UT. *Hopwood* at 944; Tex. Att'y Gen. Ltr. Op. No. 97–001 at 18. Consequently, beginning with the 1997 admissions cycle UT eliminated its affirmative action program. *2008 Top Ten Report* at 4. Although the University retained its use of the AI, it replaced consideration of race with a Personal Achievement Index ("PAI"). Defs.' Cross–Mot. for Summ. J. Statement of Facts ¶¶ 86–87. The PAI was determined by a holistic review of applications intended to identify and reward students whose merit as applicants was not adequately reflected by their class rank and test scores. *Id.* at ¶ 86; Walker Dep. at 31:7–9.

Although this AI/PAI system was facially race-neutral in accordance with *Hopwood,* it was also partially designed to increase minority enrollment. Walker

Dep. at 31:10–12. Many of the special circumstances considered in computing applicants' PAIs disproportionately affect minority candidates, including the socioeconomic status of the student's family, languages other than English spoken at home, and whether the student lives in a single-parent household. Pls.' Mot. for Part. Summ. J. Mem. at 3. Despite these measures, minority enrollment at the University decreased immediately following *Hopwood*. In 1997, the first year during which admissions were conducted under the post-*Hopwood* system, African–Americans accounted for 2.7 percent and Hispanics for 12.6 percent of the entering freshman class, compared to 4.1 percent and 14.5 percent respectively the previous year under the pre-*Hopwood* system. Pls.' Mot. for Part. Summ. J. Statement of Facts ¶ 79 (citing *2006 Top 10 Report* at 4–5 (Tables 1, 1a)).

### b. Internal Initiatives and the Top Ten Percent Law

In order to counter these decreases in minority enrollment, both UT and the Texas State Legislature adopted additional race-neutral[3] initiatives that, along with the AI/PAI system, are still in use by the University. Defs.' Cross–Mot. for Summ. J. Tab 9, Affidavit of Michael K. Orr ("Orr Aff.") ¶ 3. UT instituted several scholarship programs intended to increase the diversity yield from acceptance to enrollment, expanded the quality and quantity of its outreach efforts to high schools in underrepresented areas of the state, and focused additional attention and resources on recruitment in low-performing schools. *Id.* ¶ 4. Although the University believes these initiatives had the residual effect of improving diversity, no specific increases can be directly attributed to them and the University does not keep track of their effects on minority representation. Defs.' Cross–Mot. for Summ. J. Tab 4, Dep. of Michael K. Orr ("Orr Dep.") at 20:3–12.

The Texas State Legislature responded to *Hopwood* by passing House Bill 588, codified as TEX. EDUC.CODE § 51.803 (1997) and also known as HB 588 or the "Top Ten Percent law," a year after the Fifth Circuit issued its decision. Pls.' Mot. For Part. Summ. J. at 3–4. HB 588, which is still in effect, granted automatic admission to any public state university, including UT, for all public high school seniors in the top ten percent of their class at the time of their application, as well as the top ten percent of high school seniors attending private schools that make their student rankings available to university admissions officers.[4] TEX. EDUC.CODE § 51.803(a); Pls.' Mot. for Part. Summ. J. Statement of Facts ¶¶ 59–60.

The purpose of the Top Ten Percent law was to "ensure a highly qualified pool of students each year in the state's higher educational system" while promoting diversity among the applicant pool so "that a large well qualified pool of minority students [is] admitted to Texas universities." HB 588, House Research Organization Digest (1997) at 4–5. Though facially neutral, one of the purposes of HB 588 was to increase minority representation at UT. Defs.' Opp. to Pls.' Mot. for Prelim. Inj. at

---

3. "Race-neutral" may be a misnomer. As the parties appear to agree, many of these initiatives as well as HB 588 are intended to increase minority enrollment and thus, in reality, are "race-conscious." But *facially* these policies are race-neutral, and thus the Court will continue to use that phrase to describe policies which do not explicitly favor one racial group over another.

4. HB 588 has recently been amended, limiting the number of freshmen UT must admit under the Top Ten Percent law to 75 percent of its overall freshman class. But this change was not in effect during the relevant time period in which the Plaintiffs applied to UT.

19–20. Under HB 588, and in conjunction with the AI/PAI system and other facially race neutral initiatives instituted by UT, post-*Hopwood* minority enrollment levels have improved. *2006 Top 10 Report* at 4–5 (Tables 1, 1a). The entering freshman class of 2004, the last admitted under this race-neutral system, was 4.5 percent African–American and 16.9 percent Hispanic, compared to 2.7 percent and 12.6 percent respectively seven years earlier when *Hopwood* first went into effect. Pls.' Mot. for Part. Summ. J. Statement of Facts ¶ 79 (citing *2006 Top Ten Report* at 4–5 (Tables 1, 1a)). Seventy-five percent of all admitted African–American students and seventy-six percent of all admitted Hispanic students in 2004 qualified under the Top Ten Percent law, compared to fifty-six percent of all admitted Caucasian students. *2008 Top Ten Report* at Table 2.

### c. UT Admissions *Post-Grutter v. Bollinger* (the Current Admissions System)

*Hopwood's* prohibition on the consideration of race in admissions ended after the 2004 admissions cycle as a result of the United States Supreme Court's landmark decision in *Grutter v. Bollinger,* 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003). The Supreme Court held that universities have a compelling governmental interest "in obtaining the educational benefits that flow from a diverse student body." *Grutter,* 539 U.S. at 343, 123 S.Ct. 2325. In order to improve classroom discussion, develop the next generation of leaders, and break down racial stereotypes, the Supreme Court decided universities may consider race as a "plus" in evaluating an applicant's file in order to enroll a "critical mass" of minority students, described as "a number that encourages underrepre-

sented minority students to participate in the classroom and not feel isolated … or like spokespersons for their race." *Id.* at 318–19, 330–34, 123 S.Ct. 2325.

To conform with the *Grutter* decision, UT again modified its admissions policies. On August 6, 2003, the University of Texas Board of Regents passed a resolution authorizing each UT System school to decide "whether to consider an applicant's race and ethnicity as part of the [institution's] admission" policies, which must include "individualized and holistic review of applicant files in which race and ethnicity are among a broader array of qualifications and characteristics considered," as well as periodic reviews to evaluate the efficacy and necessity of considering applicants' race. Pls.' Mot. for Part. Summ. J. Ex. 19, Aff. of Francie A. Frederick ("Frederick Aff.") Ex. A at 4–5.

To determine whether such consideration of race was warranted, UT conducted a study in November 2003 that concluded there was not a critical mass of underrepresented minority students enrolled at the University, though it did not establish what number or percentage of minority students would meet that standard. Walker Dep. at 18:15–24; Walker Aff. ¶ 10. In their survey responses, minority students reported feeling isolated and a majority of students at the University stated there was insufficient diversity in the classroom. *Id.* ¶ 12; Walker Dep. at 21:6–13. The study also found that in 2002, 90 percent of classes with 5 to 24 students had one or zero African–American students and 43 percent had one or zero Hispanic students. Walker Aff. ¶ 11; Lavergne Aff. Ex. B, *Diversity Levels of Undergraduate Classes at the University of Texas at Austin, 1996–2002* at 8 (Table 3) ("*Diversity Study*").[5] Thus, in August 2004, after al-

---

**5.** Forty-six percent of classes with between five and twenty-four students had one or zero Asian–American students in 2002. However,

UT does not consider Asian–American students to constitute an underrepresented mi-

most a year of deliberations, the UT System approved a revised admissions policy for UT that included an applicant's race as a special circumstance reviewers may consider in evaluating an applicant's PAI. Walker Aff. ¶ 14; Defs.' Opp. to Pls.' Mot. for Prelim. Inj. at 5.

UT does not have a projected date by which it intends to cease using race as a factor in undergraduate admission decisions. Pls.' Mot. for Part. Summ. J. Mem. at 6. However, as an informal practice UT reviews its admissions procedures each year. Walker Aff. ¶ 16. Furthermore, every five years the admissions process is evaluated specifically to assess whether consideration of race is necessary to the admission and enrollment of a diverse student body, or whether race-neutral alternatives exist that would achieve the same results. *Id.; 2004 Proposal* at 32. The first formal review of UT's use of race in admissions is scheduled to begin in the fall of 2009. *2004 Proposal* at 32.

As a result of its policies, UT "ranks sixth in the nation in producing undergraduate degrees for minority groups." Walker Dep. at 10:21–24 (quoting *Diverse Issues in Higher Education,* May 31, 2007). From 1998 to 2008, a period during which the Top Ten Percent law, the AI/PAI system, and race-neutral initiatives governed the University's admissions policies and to which consideration of race was added in 2005, the enrollment of African–American students increased from three to six per-

cent of the entering freshman class and the enrollment of Hispanic students increased from 13 to 20 percent. *2008 Top Ten Report* at Table 2. However, the various programs in place make it difficult to attribute increases in minority enrollment to a specific program or programs. Walker Dep. at 13:13–17, 23:20–24. Furthermore, demographics in the state of Texas have changed substantially in recent years, indicating that increases in minority enrollment may be at least partially attributed to population shifts. Defs.' Opp. to Pls.' Mot. for Prelim. Inj. at 21–22 n. 8. While African–American students accounted for 12.56 percent of Texas high school graduates in 1997 and Hispanic students accounted for 29.78 percent, their populations had increased to account for 13.33 percent and 35.79 percent, respectively, of Texas high school graduates by 2007. Weirich Aff. ¶ 4. Underrepresented minorities are also somewhat more likely to have been admitted to UT under the Top Ten Percent law than their Caucasian peers; in 2008, 85 percent of all admitted Hispanic students and 80 percent of all admitted African–American students qualified for admission under the Top Ten Percent law, compared to 67 percent of all admitted Caucasian students.[6] *2008 Top Ten Report* at Table 2.

The system under which Plaintiffs were denied admission to UT is a product of all of the developments discussed above, with its most recent changes based on the affirmative action program used by the Univer-

---

nority at the University. Walker Aff. ¶ 11; *Diversity Study* at 8 (Table 3).

**6.** Within ethnic groups, enrolling top ten percent students generally report higher PGPAs than non-top ten percent students, though their SAT score averages vary little. Caucasian students in both the top ten percent and the non-top ten percent categories also report on average higher PGPAs and SAT scores than African–American or Hispanic students. In the entering class of 2007, Caucasian top-

ten percent students had an average PGPA of 3.25 and SAT score of 1275, and non-top ten percent students had an average PGPA of 2.95 and SAT score of 1275. African–American top ten percent students had an average PGPA of 2.65 and SAT score of 1078, and non-top ten percent students had an average PGPA of 2.42 and SAT score of 1073. His-panic top ten percent students had an average PGPA of 2.70 and SAT score of 1115, and non-top ten percent students had an average PGPA of 2.47 and SAT score of 1155.

sity of Michigan School of Law and approved by the United States Supreme Court in *Grutter v. Bollinger*. Defs.' Opp. to Pls.' Mot. for Prelim. Inj. at 15–16. As did the University of Michigan School of Law, UT uses "a holistic, multi-factor, individualized assessment of each applicant" in which race is but one of many factors. *Id.* at 4. However, the two institutions' admissions policies and procedures differ significantly due to UT's legislatively-mandated admission of Top Ten Percent Texas residents, which largely dominates the admissions process. Pls.' Mot. for Part. Summ. J. Mem. at 12. As a result of HB 588, UT operates a two-tiered system of admissions based on the Top Ten Percent law and the AI/PAI system, under which an applicant's race is taken into consideration. *Id.* at 4.

### i. Admissions Under HB 588

Before their candidacies are evaluated, all applicants to UT are divided into three pools: Texas residents, domestic non-Texas residents and international students. Defs.' Cross–Mot. for Summ. J. Tab 7, Aff. of Kendra B. Ishop ("Ishop Aff.") ¶ 7. Students compete only against other students in their respective pools for admission. *Id.* Texas residents are allotted 90 percent of all available seats, and their admission is based on the Top Ten Percent law, the AI/PAI system, or a combination of both. Defs.' Cross–Mot. for Summ. J. Tab 2, Dep. of Kendra B. Ishop ("Ishop Dep.") at 14:11–15:5; 39:16–17. The remaining ten percent of seats are awarded to domestic non-Texas residents (approximately seven percent in recent years) and international students (approximately three percent in recent years). *Id.* at 40:22–41:6; Pls.' Mot. for Part. Summ. J. at 4. Admission decisions for non-Texas resident applicants are made solely on the basis of their AI and PAI scores. Ishop Aff. ¶ 12.

Texas residents are divided into Top Ten Percent applicants and non-Top Ten Percent applicants. *2008 Top Ten Report*

at 2. A significant majority of admitted students qualify for admission due to HB 588. Defs.' Cross–Mot. for Summ. J. Statement of Facts ¶ 15. In 2008, Top Ten Percent applicants accounted for eighty-one percent of the entering class overall, compared to forty-one percent in 1998, and filled ninety-two percent of the seats allotted to Texas residents, leaving only 841 places university-wide in the Fall 2008 class for non-Top Ten Percent Texas residents. *2008 Top 10 Report* at 9 (Table 2b); Ishop Aff. ¶ 16. However, while Texas residents who graduate in the top ten percent of their high school class are guaranteed admission to the University, they are not guaranteed admission to the program of their choice. Defs.' Cross–Mot. for Summ. J. Tab 3, Dep. of Gary M. Lavergne ("Lavergne Dep.") at 15:20–21.

Admission to UT is granted by individual schools or majors. Ishop Aff. ¶ 7. Each applicant identifies their first and second choice programs at the University and competes for admission against other applicants who have identified the same program. *Id.* ¶¶ 7–10. Many colleges and majors provide automatic admission to Top Ten Percent applicants, but two groups impose additional requirements. First, because of special portfolio, audition and other requirements the Top Ten Percent law does not apply to the School of Architecture, the School of Fine Arts, and certain honors programs. Ishop Dep. at 92:6–22. Second, programs known as "impacted majors," including the School of Business, College of Communication, School of Engineering, Kinesiology, and Nursing, are obligated to accept only a certain number of Top Ten Percent applicants. *Id.* at 32:5–17. These programs are "impacted" because they could fill eighty percent or more of their available spaces each year based solely on the preferences of applicants admitted pursuant to the Top Ten Percent law. *Id.* To prevent over-subscription and allow those colleges

to admit non-Top Ten Percent applicants, UT caps the percentage of students automatically admitted to these programs at seventy-five percent of the available spaces. *Id.;* Ishop Aff. ¶ 11. Top Ten Percent students who do not receive automatic entry to their first choice program are grouped with other Texas applicants and compete against them for admission to a specific program based on their AI and PAI scores. Defs.' Cross–Mot. for Summ. J. Statement of Facts ¶ 27.

### ii. Admissions Under the Academic Index/Personal Achievement Indices

The AI/PAI system is used to make admission decisions as to all of the Top Ten Percent applicants who are denied automatic admission to the program of their choice, the non-Top Ten Percent Texas resident applicants, the domestic non-Texas resident applicants, and the international applicants. Ishop Aff. ¶ 12. Throughout the process, they remain separated in three pools: Texas residents, domestic non-Texas residents, and international applicants. Ishop Aff. ¶ 7. The current AI/PAI system has been in continuous use since 1997; its only substantive change was UT's decision after *Grutter* to authorize consideration of race in determining an applicant's PAI. Walker Dep. at 30:23–31:1; *2008 Top Ten Report* at 4. AI/PAI contains two elements: the Academic Index and the Personal Achievement Index.

First, the Academic Index predicts an applicant's freshman GPA in the program to which she has applied. Defs.' Cross–Mot. for Summ. J. Statement of Facts ¶ 25. The AI is computed using a multiple regression equation that contains four elements: (1) an applicant's high school class rank; (2) completion of UT's required high school curriculum; (3) the extent to which

the applicant exceeded the required curriculum; and, (4) SAT (verbal and math) or ACT scores. *2008 Top Ten Report* at 2. The equation varies by school, as different programs accord different relative weight to each variable, such as the applicant's math versus her critical reading standardized test scores. Lavergne Dep. at 18:5–18. The equation generates a number ranging from 0.0 to 4.1, with the additional 0.1 points awarded if the applicant has exceeded the required high school curriculum. *Id.* at 17:13–25. Students who take the SAT or ACT more than once receive the benefit of the higher score. *2008 Top 10 Report* at 5 n. 5. Some applicants' AI scores are high enough that the applicant is granted admission based on that score alone. Ishop Aff. ¶ 12. Others are low enough that their applications are considered presumptively denied. *Id.* Known as group "C", applicants whose applications are presumptively denied based on their AI score have their file reviewed by senior admission staff readers who either award a default PAI score of 3–3–3 to the application or determine the file warrants a full review before any PAI scores are assigned. *Id.*

Second, the Personal Achievement Index accounts for all remaining parts of the applicant's file. Ishop Aff. ¶ 4. The index is based on an equation containing three scores: one score for each of the two required essays and a third score, called the personal achievement score, representing a holistic evaluation of the applicant's entire file. Defs.' Cross–Mot. for Summ. J. Statement of Facts ¶¶ 29, 49. Each element receives a score from 1 to 6 and is inserted into the PAI equation, which gives slightly greater weight to the personal achievement score than to the mean of the two essays.[7] Lavergne Dep. at 57:14–17, 21:23.

---

**7.** PAI = [ (personal achievement score * 4) + (average essay score * 3) ] / 7. Lavergne Dep.

Each of the two essay scores is the result of a holistic evaluation of the essay as a piece of writing based on its complexity of thought, substantiality of development, and facility with language. Defs.' Cross–Mot. for Summ. J. Tab 1, Dep. of Brian Bremen ("Bremen Dep.") at 10:19–21. The majority of essays are written on the two basic topics provided by the University, though some programs require applicants to base their essays on different, program-specific topics. Ishop Dep. at 12:17–19. The scores are awarded by a member of the UT admissions office staff who relies on annual training, a scoring guide, and a set of samples, all of which are provided each year by a UT faculty member who is a nationally recognized expert in holistic scoring. Bremen Dep. at 10:1–12, 18–21, 31:9; Ishop Aff. ¶ 13. Additionally, senior staff members perform quality control, verifying that awarded scores are in line with those they would give. Bremen Dep. at 13:14–20. The most recent study, conducted in 2005, found that essay readers scored within one point of one another 91 percent of the time and holistic file readers scored within one point of one another 88 percent of the time, reflecting significant consistency. Lavergne Aff. ¶ 8.

The third PAI element is the personal achievement score, which is based on an evaluation of the file in its entirety by senior members of the admissions staff. Bremen Dep. at 14:10–15:6. The evaluators conduct a holistic review considering the applicant's demonstrated leadership qualities, extracurricular activities, awards and honors, work experience, service to the school or community, and special circumstances. *2008 Top Ten Report* at 2. The relevant special circumstances include the applicant's family's socio-economic status, her school's socio-economic status, her family responsibilities, whether she lives in a single-parent home, whether languages other than English are spoken at home, her SAT/ACT score compared to her school's average score and, as of 2005, her race. *Id.* The essays are re-read during this process, but only for consideration of the information they convey, rather than to assess the quality of the student's writing. Bremen Dep. at 17:5–13. Students may also choose to submit a resume, supplemental essays, or any additional information such as artwork and portfolios for consideration during this process. Ishop Dep. at 12:19–13:5. None of the elements are considered individually, or given a numerical value and then added together; instead, the file is evaluated in its entirety in order to provide a better understanding of the student as a person and place her achievements in context. Bremen Dep. at 22:8–13; Ishop Dep. at 13:9–14:19.

Because an applicant's race is identified at the front of the admissions file, reviewers are aware of it throughout the evaluation. Ishop Dep. at 19:20–24. Race in and of itself does not affect the score but is instead used to place the student's achievements into context and reveal whether she possesses a valuable "sense of cultural awareness." Bremen Dep. at 30:25, 41:5–7. Used in this manner, it can positively impact applicants of all races, including Caucasian, or may have no impact whatsoever. Ishop Dep. at 57:2–58:12. Given these guidelines and the fact race, like all the other elements, is never awarded a numerical value or considered alone, it is difficult to evaluate which applicants have been positively or negatively affected by its consideration or which applicants were ultimately offered admission due to their race who would not have otherwise been offered admission. Ishop Dep. at 19:20–20:3, 23:10–14. Yet, even though race is not determinative, it is undisputedly a

57:41–17.

meaningful factor that can make a difference in the evaluation of a student's application. Pls.' Mot. for Part. Summ. J. Mem. at 5; Pls.' Mot. for Part. Summ. J. Ex. 8, Dep. of Bruce Walker ("Walker Dep.") at 45:5–12. Although a candidate's race is known throughout the application process, no admissions office employee or anyone else at UT monitors the racial or ethnic composition of the entire group of admitted students in order to decide whether a particular applicant will be admitted. Ishop Aff. ¶ 17.

Once AI and PAI scores have been awarded, the data is entered in matrices created for each major or school, depending on whether the program to which the student applied admits students to the college or into a specific major. Ishop Aff. ¶ 14. The matrix is set up as a graph, with the vertical left axis representing an applicant's PAI score and the horizontal bottom axis representing an applicant's AI score. *Id.* Applicants are identified only by their AI/PAI numbers, with the upper left corner containing the highest combined scores and the lower right corner containing the lowest combined scores. *2008 Top 10 Report* at 3 (Figure 1). Each cell on the matrix contains a number representing the total number of applicants who share that particular combination of AI and PAI scores. Defs.' Cross–Mot. for Summ. J. Statement of Facts ¶ 66.

Once all applicants have been placed within the appropriate matrix cell, a liaison for the school or major establishes a cut-off line. Ishop Dep. at 38:6–8. The line is drawn in a "stair step" manner and UT offers admission to applicants whose AI and PAI scores place them in cells located to the left of the line. Defs.' Cross–Mot. for Summ. J. Statement of Facts ¶ 70. Placement of the cutoff line depends on the combination of AI/PAI scores desired by the school and the number of available slots. Ishop Dep. at 47:10–24.

Applicants denied admission to their first choice program under this process are then "cascaded" down to the matrix of their second choice. Defs.' Cross–Mot. for Summ. J. Statement of Facts ¶¶ 69–70. The influx of new applicants changes the matrices' composition, and the cut-off lines are accordingly re-adjusted to accommodate this shift. Ishop Aff. ¶ 14. After all applicants have been considered for their second choice program, Top Ten Percent applicants who have not been admitted to either their first or second choice programs are automatically admitted as Liberal Arts Undeclared majors. *Id.* All remaining applicants are cascaded into the Liberal Arts Undeclared matrix, where they compete for the remaining seats using the same procedure discussed above. Defs.' Cross–Mot. for Summ. J. Statement of Facts ¶ 75. Any non-Texas residents and international applicants who fail to gain admission into Liberal Arts Undeclared are denied admission to UT. Ishop Dep. at 47:2–5.

### iii. The Summer and Coordinated Admission Programs

Texas residents, however, are never denied admission to UT if they submit a complete entering freshman application by the published deadlines. *2008 Top Ten Report* at 3. If not admitted to the entering fall class, a Texas resident is offered admission to either the summer program or the Coordinated Admission Program ("CAP"). *Id.* The summer program allows students to begin their studies at UT during the summer, joining the regularly admitted students in the fall. Ishop Aff. ¶ 15. Approximately eight hundred students are enrolled in that program each year. Ishop Dep. at 47:10–24. CAP entitles its participants to automatically transfer to UT if they meet certain conditions, including the completion of thirty credit hours with a cumulative GPA of 3.2 or

higher at a participating UT System campus during their freshman year. Ishop Aff. ¶ 15.

Applicants located in AI/PAI cells on the Liberal Arts Undeclared matrix near those selected for admission to the fall class are considered for admission to the summer class, while all other applicants are automatically admitted into CAP. Ishop Aff. ¶ 15. The potential summer students' files are re-read in their entirety. *Id.* Although senior staff members conducting the review are aware of the scores originally awarded to each applicant's file, they are not bound by them and do not recalculate a new score, but rather make the summer admissions decision based on the file as a whole. Ishop Dep. at 27:10–22. Admission to the summer program is offered solely based on this individualized, holistic review. *Id.* at 29:10–14. Although it is relatively rare, reviewers may still at this late stage admit an applicant to the entering fall class. *Id.* at 49:5–50:12. Furthermore, although the readers conducting this review, like all admission office staffers, have access to a head count of admitted students by race, they do not take such information into account as part of the review process. Ishop Aff. ¶ 15. All Texas residents not offered admission to the summer class through this process are then accepted to CAP, ending the admissions process at UT for that cycle. *Id.* ¶ 14.

## ANALYSIS

### I. Standard

Summary judgment may be granted if the moving party shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). In deciding summary judgment, the Court construes all facts and inferences in the light most favorable to the nonmoving party. *Richter v. Merchs. Fast Motor Lines, Inc.,* 83 F.3d 96, 98 (5th Cir.1996). The standard for determining whether to grant summary judgment "is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the nonmoving party based upon the record evidence before the court." *James v. Sadler,* 909 F.2d 834, 837 (5th Cir.1990).

Both parties bear burdens of production in the summary judgment process. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). First, the moving party has the initial burden of showing there is no genuine issue of any material fact and judgment should be entered as a matter of law. FED.R.CIV.P. 56(c); *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party must then come forward with competent evidentiary materials establishing a genuine fact issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson,* 477 U.S. at 256–257, 106 S.Ct. 2505. However, "[n]either 'conclusory allegations' nor 'unsubstantiated assertions' will satisfy the non-movant's burden." *Wallace v. Tex. Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996).

The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 2. Consequently, the "government may treat people differently because of their race only for the most compelling reasons." *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). Thus, as the Supreme Court has held, "all racial classifications imposed by govern-

ment 'must be analyzed by a reviewing court under strict scrutiny.'" *Grutter v. Bollinger,* 539 U.S. 306, 326, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) (quoting *Adarand,* 515 U.S. at 227, 115 S.Ct. 2097). To survive strict scrutiny, the racial classification must be "narrowly tailored to further compelling governmental interests." *Grutter,* 539 U.S. at 326, 123 S.Ct. 2325.

## II. *Grutter v. Bollinger*

In 2003, the Supreme Court squarely addressed and decided the question of "[w]hether diversity is a compelling interest that can justify the narrowly tailored use of race in selecting applicants for admission to public universities." *Id.* at 322, 123 S.Ct. 2325. The Supreme Court answered the question in the affirmative, finding that the University of Michigan Law School (the "Law School") had "a compelling interest in attaining a diverse student body." *Id.* at 328, 123 S.Ct. 2325. The Supreme Court also found the Law School's admissions program to be narrowly tailored despite the existence of race-neutral alternatives, including "percentage plans" similar to Texas' Top Ten Percent law. *Id.* at 339–40, 123 S.Ct. 2325. As the landmark case regarding the consideration of race as part of college admissions, the facts of *Grutter* deserve particular attention.

Michigan's Law School is one of the top, and most selective, law schools in the nation, routinely admitting 10% or less of applicants. *Id.* at 312–13, 123 S.Ct. 2325. In addition to selecting a highly qualified and promising group of students, the Law School sought, through its admissions process, to admit "a mix of students with varying backgrounds and experiences who will respect and learn from each other." *Id.* at 314, 123 S.Ct. 2325 (citation omitted). The "hallmark" of the admissions policy was "its focus on academic ability coupled with a flexible assessment of applicants' talents, experiences, and potential

'to contribute to the learning of those around them.'" *Id.* at 315, 123 S.Ct. 2325 (citation omitted). Importantly, admissions officials evaluated each applicant individually based on all of the information available, which included a personal statement, letters of recommendation, an essay on how the applicant would contribute to the life and diversity of the school, undergraduate grades, and the applicant's score on the Law School Admission Test ("LSAT"). *Id.* The admissions policy specifically reaffirmed the school's commitment to "racial and ethnic diversity with special reference to the inclusion of students from groups which have been historically discriminated against, like African–Americans, Hispanics and Native Americans, who without this commitment might not be represented in our student body in meaningful numbers." *Id.* at 316, 123 S.Ct. 2325 (citation omitted). Specifically, the Law School sought to enroll a "'critical mass' of [underrepresented] minority students" in order to "ensure[e] their ability to make unique contributions to the character of the Law School." *Id.* (citations omitted).

This policy was challenged by Barbara Grutter, a white Michigan resident who was denied admission to the Law School in 1996, as a violation of the Fourteenth Amendment and federal civil rights laws. *Id.* at 316–17, 123 S.Ct. 2325. After an extensive bench trial, the district court "concluded that the Law School's use of race as a factor in admissions decisions was unlawful." *Id.* at 321, 123 S.Ct. 2325. The Sixth Circuit Court of Appeals, sitting en banc, reversed the district court's judgment and held that under Justice Powell's opinion in *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), diversity was a compelling state interest and the Law School's use of race was narrowly tailored. *Id.* The Supreme Court affirmed, holding "the

Equal Protection Clause does not prohibit the Law School's narrowly tailored use of race in admissions decisions to further a compelling interest in obtaining the educational benefits that flow from a diverse student body." *Id.* at 343, 98 S.Ct. 2733.

In light of this Supreme Court jurisprudence, the Court now turns to the instant dispute.

## III. Compelling Governmental Interest

■ *Grutter* clearly establishes that a public university "has a compelling interest in attaining a diverse student body." *Id.* at 328, 123 S.Ct. 2325. "[A]ttaining a diverse student body is at the heart of the Law School's proper institutional mission, and [ ] 'good faith' on the part of a university is 'presumed' absent 'a showing to the contrary.'" *Id.* at 329, 123 S.Ct. 2325 (quoting *Bakke*, 438 U.S. at 318–19, 98 S.Ct. 2733). The Supreme Court noted several benefits stemming from a diverse student body:

> These benefits are substantial. As the District Court emphasized, the Law School's admissions policy promotes "cross-racial understanding," helps to break down racial stereotypes, and "enables [students] to better understand persons of different races." These benefits are "important and laudable," because "classroom discussion is livelier, more spirited, and simply more enlightening and interesting" when the students have "the greatest possible variety of backgrounds."

*Id.* at 330, 123 S.Ct. 2325 (citations omitted). Furthermore, student body diversity "better prepares students for an increasingly diverse workforce and society, and better prepares them as professionals." *Id.* (citation omitted). "In order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity." *Id.* at 332, 123 S.Ct. 2325.

Crucial to the Supreme Court's finding of a compelling interest was the fact the Law School did not attempt "to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin," but rather sought a "critical mass" of minority students. *Id.* (quoting *Bakke*, 438 U.S. at 307, 98 S.Ct. 2733 (opinion of Powell, J.)). The Supreme Court noted that attempting to assure a specific percentage of a minority group would run afoul of the Supreme Court's prohibition on racial quotas and "outright racial balancing." *Id.* at 330, 123 S.Ct. 2325. Consequently, the definition of "critical mass" put forward by the Law School and approved by the Supreme Court was necessarily less than precise. Critical mass was described by Law School officials as "meaningful numbers," "meaningful representation," "a number that encourages underrepresented minority students to participate in the classroom and not feel isolated," or "numbers such that underrepresented minority students do not feel isolated or like spokespersons for their race." *Id.* at 318–19, 123 S.Ct. 2325.

Following the Supreme Court's decision in *Grutter*, the University of Texas Board of Regents passed a resolution authorizing each UT System school to decide "whether to consider an applicant's race and ethnicity as part of the [institution's] admission" policies, which must include "individualized and holistic review of applicant files in which race and ethnicity are among a broader array of qualifications and characteristics considered," as well as periodic reviews to evaluate the efficacy and necessity of considering applicants' race. Pls.' Mot. for Part. Summ. J. Ex. 19, Aff. of Francie A. Frederick ("Frederick Aff.") Ex. A at 4–5.

After conducting its review, UT issued its *Proposal to Consider Race and Ethnicity in Admissions.* *See* Defs.' Cross–Mot. for Summ. J. Tab 11, Affidavit of N. Bruce Walker ("Walker Aff.") Ex. A, *Proposal to Consider Race and Ethnicity in Admissions,* June 25, 2004 at 24–25 ("*2004 Proposal*"). The *2004 Proposal* specifically addresses the rationale behind considering race as a part of the undergraduate admissions process:

A comprehensive college education requires a robust exchange of ideas, exposure to differing cultures, preparation for the challenges of an increasingly diverse workforce, and acquisition of competencies required of future leaders. This type of academic environment is a goal of the University of Texas at Austin and admission decisions must take into account this goal. The University of Texas at Austin handles a very large number of undergraduate applications and must select from among a highly qualified pool only the number of students in can accommodate. In light of the institutional goal, admission decisions result from both an assessment of the academic strength of each applicant's record and an individualized, holistic review of each applicant, taking into consideration the many ways in which the academically qualified individual might contribute to, and benefit from, the rich, diverse, and challenging education environment of the University …

Results indicate that, in a large percentage of [undergraduate] courses, some minority groups are represented by only one student or by none at all. The University of Texas at Austin did not have a critical mass of minority students sufficient to provide an optimal educational experience in 1996 (the pre-*Hopwood* period), and after seven years of good faith race-neutral admission policies, the University still has not reached a critical mass at the classroom level.

If The University of Texas at Austin is to accomplish its mission and fulfill its flagship role, it must prepare its students to be the leaders of the State of Texas. In the near future, Texas will have no majority race; tomorrow's leaders must not only be drawn from a diverse population but must also be able to lead a multicultural workforce and to communicate policy to a diverse electorate. The University has a compelling educational interest to produce graduates who are capable of fulfilling the future leadership needs of Texas.

Because the University's educational mission includes the goal of producing future educational, cultural, business, and sociopolitical leaders, the undergraduate experience for each student must include *classroom* contact with peers of differing racial, ethnic, and cultural backgrounds. The proposal to consider race in the admission process is not an exercise in racial balancing but an acknowledgment that significant differences between the racial and ethnic makeup of the University's undergraduate population and the state's population prevent the University from fully achieving its mission. In short, from a racial, ethnic, and cultural standpoint, students at the University are currently being educated in a less-than-realistic environment that is not conducive to training the leaders of tomorrow. For the University to adequately prepare future leaders, it must include a critical mass of students from traditionally underrepresented backgrounds.

Critical mass, which is an adequate representation of minority students to assure educational benefits deriving from diversity, affects in a positive way all students because they learn that there is not "one" minority or majority view. In addition, the [Supreme] Court recognized that critical mass is essential

in order to avoid burdening individuals with the role of "spokespersons" for their race or ethnicity. Thus, there is a compelling educational interest for the University not to have large numbers of classes in which there are no students—or only a single student—of a given underrepresented race or ethnicity.

The use of race-neutral policies and programs has not been successful in achieving a critical mass of racial diversity at The University of Texas at Austin. While the number of African American and Hispanic students has risen slightly above 1996 levels, these students still represent only 3% and 14%, respectively, of the entering freshman class. The race-neutral efforts have failed to improve racial diversity within the classroom. In fact ... for Fall, 2002, there were *more* classes with no or only one African American or Hispanic student than there had been in Fall, 1996. With so few underrepresented minorities in the classroom, the University is less able to provide an educational setting that fosters cross-racial understanding, provides enlightened discussion and learning, and prepares students to function in an increasingly diverse workforce and society.

*2004 Proposal* at 23–25 (citation and footnote omitted).

■ As articulated in the *2004 Proposal*, UT's underlying interest in its decision to consider race as one of the factors in its admissions process closely mirrors the justification provided for the Michigan Law School's use of race and approved by the Supreme Court.[8] Both policies attempt to promote "cross-racial understanding," "break down racial stereotypes," enable students to better understand persons of other races, better prepare students to

function in a multi-cultural workforce, cultivate the next set of national leaders, and prevent minority students from serving as "spokespersons" for their race. *Grutter*, 539 U.S. at 319–20, 330–33, 123 S.Ct. 2325; 2004 Proposal at 23–25. Notably, the Supreme Court also recognized in *Grutter* that "[t]he Law School's educational judgment that such diversity is essential to its educational mission is one to which we defer." 539 U.S. at 328, 123 S.Ct. 2325. Despite the obvious similarities between the admissions policy approved by the Supreme Court in *Grutter* and UT's policy, the Plaintiffs still contend UT's admissions program does not further a compelling governmental interest for two reasons. Pls.' Mot. for Partial Summ. J. at 12–18.

First, Plaintiffs argue UT's policy is "untethered to the educational benefits" of a diverse student body identified and approved by *Grutter*. *Id.* at 13. Specifically, Plaintiffs argue that because UT's diversity goals are "open-ended"—or, in other words, because UT has made no effort to define a percentage of its student body that must be filled by underrepresented minorities in order to achieve critical mass that therefore UT's use of race is not tied to the educational benefits of a diverse student body. Rather, Plaintiffs argue it "reflects a pursuit of racial balancing that reflects Texas' racial demographics." *Id.* at 14–15. Second, Plaintiffs also argue UT lacks a compelling interest because it has already achieved or exceeded "critical mass" through its race-neutral policies, most notably the Top Ten Percent law. *Id.* at 17. Plaintiffs argue that under Supreme Court precedent, "critical mass can be no greater than 20% minority enrollment." *Id.* at 18.

---

**8.** UT's policy is explicitly and admittedly based on the Law School's policy and the

*Grutter* case.

The Court finds both the Plaintiffs' arguments unpersuasive and finds UT has a compelling interest in student body diversity as articulated in *Grutter*. First and foremost, *nothing* in *Grutter* suggests a university must establish a specific percentage, or range of percentages, the achievement of which would satisfy critical mass. Plaintiffs cite evidence from the district court hearing and opinion in *Grutter* that the school officials considered "critical mass" to be somewhere between 10–20 percent of the student body. *Id.* at 15; *Grutter v. Bollinger*, 137 F.Supp.2d 821, 832 (E.D.Mich.2001). This evidence, however, is completely unpersuasive to prove the contention that a university must establish a specific percentage of minority enrollment for critical mass. To begin with, the district court that cited this evidence reached the opposite conclusion of the Supreme Court, and was reversed on appeal. Secondly, the actual policy adopted by the Law School *omitted* any reference to a specific figure or inclusion of a percentage "ceiling" because it "could be misconstrued as a quota." *Grutter*, 137 F.Supp.2d at 835. Finally, the *Grutter* decision clearly lacks any suggestion that there exists a specific percentage of minority enrollment that satisfies "critical mass" and above which a school lacks a compelling interest justifying the use of race in admissions. Instead, the Supreme Court implicitly endorses the Law School's general definition of "critical mass" as "meaningful numbers," "meaningful representation," "a number that encourages underrepresented minority students to participate in the classroom and not feel isolated," or "numbers such that underrepresented minority students do not feel isolated or like spokespersons for their race" by citing these definitions in its decision. Furthermore, the Law School's policy, which was *found* to be constitutional, did not have a specific percentage of minority enrollment cited as its goal. *Grutter*, 539 U.S. at 318–19, 123 S.Ct. 2325.

In fact, *Grutter* stands for the opposite proposition—a school which articulates a specific percentage of its student body that must be filled by minority students would violate the constitutional prohibition of racial balancing or racial quotas. *Id.* at 329–30, 334, 123 S.Ct. 2325. "Properly understood, a 'quota' is a program in which a certain fixed number or proportion of opportunities are 'reserved exclusively for certain minority groups.'" *Id.* at 335, 123 S.Ct. 2325 (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 496, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (plurality opinion)). "Quotas 'impose a fixed number or percentage which must be attained, or which cannot be exceeded.'" *Id.* (quoting *Sheet Metal Workers' v. EEOC*, 478 U.S. 421, 495, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986) (O'Connor, J., concurring in part and dissenting in part)). Establishing a specific percentage of minority student enrollment would violate the "paramount" characteristic of a constitutional race-conscious admissions program, namely a flexible and individual evaluation of each applicant. *Id.* at 336–37, 123 S.Ct. 2325. Thus, under *Grutter* the establishment of a specific percentage for critical mass would be a strong indicator of an impermissible racial quota or racial balancing, and consequently critical mass must be defined based on the educational benefits provided by the admission of the individual students rather than on the satisfaction of a numerical percentage. As was the policy of the Michigan Law School, UT has not established a specific percentage of minority enrollment that must be met, but rather considers race as simply one factor in its admissions decisions.

The Plaintiffs' argument that "critical mass" of minority enrollment cannot exceed twenty percent of total enrollment, in

light of the foregoing law, is similarly without merit. As explained above, *Grutter* does not require an articulation of a specific percentage of minority enrollment for the achievement of critical mass. Nor does the case indicate, in any way, shape, or form, that "critical mass" is limited to, at most, twenty percent minority enrollment. The Court disagrees with Plaintiffs' claim that "Supreme Court precedent demonstrates that critical mass can be no greater than 20% minority enrollment." Pls.' Mot. for Partial Summ. J. at 18. The first case Plaintiffs cite is the district court's decision in *Grutter*, which was reversed on appeal and in which the Supreme Court found the Law School's admissions policy to be constitutional despite the lack of any upper limit or cap on its minority enrollment. The second case cited, *United States v. Virginia*, 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), did not even involve the use of race as a factor in admissions. Instead, the case involved the Virginia Military Institution's ("VMI") unconstitutional exclusion of women from admission. *Virginia*, 518 U.S. at 519, 116 S.Ct. 2264. The Supreme Court noted, "with recruitment, VMI could 'achieve at least 10% female enrollment'— 'a sufficient "critical mass" to provide the female cadets with a positive educational experience.'" *Id.* at 523, 116 S.Ct. 2264 (citation omitted). Plaintiffs cite this statement, taken out of context, as support for its argument that public universities do not have a compelling interest that would justify the consideration of race as part of its admissions process once it has achieved 20 percent minority enrollment. This statement does not support the Plaintiffs' position. In context, the statement is made to support the claim that there was sufficient female interest in attending VMI such that, if admission was open to women, women would not be so isolated they would be unable to have a positive educational experience. *See Id.* The case in no way

relates to the extent to which universities may consider an applicant's race, or for that matter her gender, in making admissions decisions. The last case Plaintiffs cite, *Comfort ex rel. Neumyer v. Lynn Sch. Comm.*, 283 F.Supp.2d 328, 357 (D.Mass.2003), also fails to establish a 20 percent ceiling for critical mass. In fact, reading beyond the cherry-picked sentences cited by Plaintiffs, *Comfort* recognizes the benefits derived from a diverse student body extend well beyond the 20% number:

> ... 20% is not a magical shut-off point for gains from intergroup contact. The gains occur along a continuum: as the racial composition of school populations creeps closer to balanced, racial stereotyping and tension is reduced and racial harmony and understanding increases.

*Id.* Furthermore, the 20 percent number cited in *Comfort* is the "figure below which members of a racial minority in a given setting feel isolated or stigmatized." *Id.* Thus, according to that logic, the *minimum* percentage of minority enrollment that must be achieved to avoid isolation or stigmatization is 20 percent, not the maximum, and that number applies to "a minority group," rather than to minority students as a whole. *Comfort* also recognizes there is no "magic number" for critical mass. *Id. Comfort* in no way establishes, or even endorses, a maximum of 20 percent minority enrollment for the achievement of critical mass-if anything, it endorses 20 percent enrollment per minority group as a *minimum*. As a result, the Court finds the fact the combined minority enrollment at UT exceeds 20 percent of the freshman class does not mean UT lacks a compelling state interest that justifies its continued consideration of race as part of its admissions process.

Plaintiffs also argue UT's use of race in admissions "is divorced from the edu-

cational benefits attained by the achievement of critical mass" because the policy primarily benefits African–American and Hispanic students and does not benefit other minority groups, specifically Asian–Americans. Pls.' Mot. for Part. Summ. J. at 16. However, Plaintiffs cite no evidence to show racial groups other than African–Americans and Hispanics are *excluded* from benefitting from UT's consideration of race in admissions. As the Defendants point out, "the consideration of race, within the full context of the entire application, may be beneficial to *any* UT Austin applicant—including whites and Asian–Americans." Defs.' Cross–Mot. for Summ. J. at 12; Ishop Dep. at 56:21–57:25.

Moreover, nothing in *Grutter* requires a university to give equal preference to every minority group. As the Supreme Court recognized, the Michigan Law School's policy did not mention Asians or Jews "because members of those groups were already being admitted to the Law School in significant numbers." *Grutter*, 539 U.S. at 319, 123 S.Ct. 2325. Throughout the opinion, the Supreme Court recognizes the Law School's interest in ensuring the admission of "underrepresented" minority students. *Id.* at 316, 318–20, 335–363, 338, 341, 123 S.Ct. 2325. It is undisputed that UT considers African–Americans and Hispanics to be underrepresented but does not consider Asian–Americans to be underrepresented. *See* Defs.' Cross–Mot. for Summ. J. Statement of Facts ¶ 92. However, the Court fails to see how UT's determination is improper or renders its consideration of race unconstitutional. As mentioned above, *Grutter* explicitly authorizes universities to exercise its discre-

tion in determining which minority groups should benefit from the consideration of race and emphasizes the importance of including "underrepresented" minority groups.

The mere fact that the gross number of Hispanic students attending UT exceeds the gross number of Asian–American students attending UT does not mean Hispanics are not an "underrepresented" minority group. Hispanic students remain underrepresented at UT when their student population as a percentage of the entire UT population is compared to Texas' Hispanic and Latino population. According to the latest statistics from the United States Census Bureau, Texas' population is 36 percent Hispanic or Latino.[9] In contrast, in 2008 only 20 percent of admitted and/or enrolled UT students were Hispanic. *2008 Report* at Table 1.[10] Thus, compared to their percentage of Texas' population as a whole, Hispanics remain underrepresented. Asian–Americans, on the other hand, are largely *overrepresented* compared to their percentage of Texas' population. Plaintiffs suggest that any reference to demographic information in connection with the consideration of race in admissions constitutes an "attempt at engineering the racial demographics of UT Austin to correspond to the racial demographics of the State" and amounts to unconstitutional racial balancing. Pls.' Mot. for Part. Summ. J. at 16 n. 3. Plaintiffs are wrong. The mere concept of an "underrepresented" minority group, adopted and endorsed by the Supreme Court in *Grutter* and various other cases, necessarily involves the comparison of a minority group's represen-

---

**9.** The Court takes judicial notice of the population estimates promulgated by the United States Census Bureau at http://quickfacts.census.gov/qfd/states/48000.html.

**10.** For comparison purposes, the Court notes the following statistics: African Americans—

12 percent of the Texas population, 6 percent of UT's 2008 freshman class; Caucasians (non-Hispanic)—47.9 percent of the Texas population, 52 percent of UT's 2008 freshman class; and Asian–Americans—3.4 percent of the Texas population, 19 percent of UT's 2008 freshman class.

tation at a university to its representation in society; otherwise, there would be no way to determine which minority groups qualify as underrepresented and which ones do not. The constitutional prohibition on racial balancing and racial quotas does not require universities to completely ignore societal demographics, but rather prohibits universities from insulating minority applicants from competition with all other applicants or reserving a fixed number of positions for minority students. *Grutter,* 539 U.S. at 334–35, 123 S.Ct. 2325. There is no evidence even suggesting UT insulates minority students from competition or reserves a fixed number of positions for minority students.[11] In fact, Plaintiffs themselves allege UT does not have a specific number or percentage of minority student enrollment that must be achieved in order to create a "critical mass." Thus, the Court finds the mere fact UT considers some minority groups "underrepresented" but not others does not indicate as a matter of law that UT's consideration of race in admissions is "divorced from the educational benefits attained by the achievement of critical mass." Pls.' Mot. for Part. Summ. J. at 16.

Plaintiffs also criticize UT's reliance on diversity statistics at the classroom level. Pls.' Resp. & Reply at 18–20. In 2002, as the undisputed evidence shows, 79 percent of UT classes had zero or one African–American students.[12] *2004 Proposal* at Table 8. UT offered over 5,631 classes that year, meaning approximately 4,448 classes had one or zero African–American students. *Id.* Similarly, 30 percent of these classes had zero or one Hispanic students; in other words, 1,689 classes had zero or one Hispanic students. Plaintiffs argue there has been no recognition of "individual classroom diversity" as a compelling state interest. *Id.* at 18. But Plaintiffs misconstrue the importance of the classroom diversity numbers. Defendants have not asserted a compelling interest in obtaining diversity in every single class—as the Plaintiffs argue, such an attempt would be largely unworkable without unreasonable and unheard of control over each student's schedule. Rather, the large-scale absence of African–American and Hispanic students from thousands of classes indicates UT has not reached sufficient critical mass for its students to benefit from diversity and illustrates UT's need to consider race as a factor in admissions in order to achieve those benefits. The benefits *Grutter* recognizes occur largely within the classroom; thus, the absence of minority students from a large number of classes demonstrates UT's ongoing need to improve diversity campus-wide.

In short, here is no "magic number" for the achievement of critical mass. The Michigan Law School policy, approved by the Supreme Court, did not include any specific percentage, or range of percentages, of minority enrollment that would automatically satisfy "critical mass." Instead, as articulated in *Grutter,* critical mass is defined by the educational benefits diversity provides, both to underrepresented minorities and to the student body at

---

**11.** If Defendants are in fact attempting to match minority enrollment to state demographics, they are doing a particularly bad job of it, since Hispanic enrollment is less than two-thirds of the Hispanic percentage of Texas' population and African–American enrollment is only half of the African–American percentage of Texas' population, whereas Asian–American enrollment is more than five times the Asian–American percentage of Texas' population.

**12.** The Court refers to classes with five or more students. For classes with five to 24 students (a smaller sampling of classes, since it excludes classes with more than 24 students), 90 percent had one or zero African–American students.

large. 539 U.S. at 318–20, 324–25, 328–33, 123 S.Ct. 2325 ("the Law School's concept of critical mass is defined by reference to the educational benefits that diversity is designed to produce."). Despite the Plaintiffs' assertions to the contrary, 20 percent minority enrollment is no universal "ceiling" over which additional diversity ceases to be a compelling state interest. After conducting a comprehensive study, UT concluded it had not achieved critical mass and was not adequately providing the benefits from diversity to its students. *See* *2004 Proposal.* Thus, like the Michigan Law School, UT decided to consider race as one of several factors in its admissions process in order to increase diversity. Based on the clear holding of the Supreme Court in *Grutter* and the undisputed facts of this case, the Court finds UT "has a compelling interest in attaining a diverse student body" sufficient to justify its consideration of race as a part of its admissions process. *Grutter,* 539 U.S. at 328, 123 S.Ct. 2325.

## IV. Narrowly Tailored

Having found UT has a compelling interest in attaining a diverse student body, the Court must next determine whether UT's use of race in admissions is narrowly tailored to further that interest. *Grutter,* 539 U.S. at 326, 123 S.Ct. 2325. *Grutter* specifically addresses what it means for a race-conscious admissions program to be narrowly tailored:

> To be narrowly tailored, a race-conscious admissions program cannot use a quota system-it cannot "insulat[e] each category of applicants with certain desired qualifications from competition with all other applicants." *Bakke,* 438 U.S., at 315, 98 S.Ct. 2733 (opinion of

Powell, J.). Instead, a university may consider race or ethnicity only as a " 'plus' in a particular applicant's file," without "insulat[ing] the individual from comparison with all other candidates for the available seats." *Id.,* at 317, 98 S.Ct. 2733.

539 U.S. at 334, 123 S.Ct. 2325. Furthermore:

> Narrow tailoring does not require exhaustion of every conceivable race-neutral alternative. Nor does it require a university to choose between maintaining a reputation for excellence or fulfilling a commitment to provide educational opportunities to members of all racial groups … Narrow tailoring does, however, require serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks.

*Id.* at 339, 123 S.Ct. 2325.

■ UT considers race in its admissions process as a factor of a factor of a factor of a factor. As described in exhaustive detail above, race is one of seven "special circumstances," [13] which is in turn one of six factors that make up an applicants personal achievement score. *2008 Top Ten Report* at 2. The personal achievement score is one of three factors, along with two essays, that together make up the Personal Achievement Index ("PAI"). Lavergne Dep. at 57:14–17, 21:23. Finally, the PAI score is one of two elements that make up an applicant's ultimate AI/PAI score, which determines whether a non-Top Ten Percent applicant will receive admission. Ishop Aff. ¶ 12. At no point in the process is race considered individually or given a numerical value; instead, the file is evaluated in its entirety in order to provide a

---

13. The other special circumstances factors are the applicant's family's socio-economic status, her school's socio-economic status, her family responsibilities, whether she lives in a single-parent home, whether languages other than English are spoken at home, her SAT/ACT score compared to her school's average score. *2008 Top Ten Report* at 2.

better understanding of the student as a person and place her achievements in context. Bremen Dep. at 22:8–13; Ishop Dep. at 13:9–14:19. Although an applicant's race is available throughout the application process, no admissions office employee or anyone else at UT monitors the racial or ethnic composition of the group of admitted students in order to decide whether an applicant will be admitted. Ishop Aff. ¶ 17.

UT's admissions policy shares many of the same features as the Law School's policy in *Grutter*, which is not surprising considering the parties agree UT's policy was based on the Law School's policy. The Supreme Court described the important features of the Law School's policy as follows:

> [T]he Law School engages in a highly individualized, holistic review of each applicant's file, giving serious consideration to all the ways an applicant might contribute to a diverse educational environment. The Law School affords this individualized consideration to applicants of all races. There is no policy, either *de jure* or *de facto*, of automatic acceptance or rejection based on any single "soft" variable. Unlike the program at issue in *Gratz v. Bollinger* [539 U.S. 244, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003)] ... the Law School awards no mechanical, predetermined diversity "bonuses" based on race or ethnicity ... Like the Harvard plan, the Law School's admissions policy "is flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight."

*Grutter*, 539 U.S. at 337, 123 S.Ct. 2325 (citations omitted). Furthermore:

> "The Law School's current admissions program considers race as one factor among many, in an effort to assemble a student body that is diverse in ways broader than race."

*Id.* at 340, 123 S.Ct. 2325. Similarly, UT's admissions policy provides a "highly individualized, holistic review" of every applicant, regardless of race or ethnicity, and considers multiple factors that contribute to "diversity" aside from race or ethnicity. UT does not accept any applicant based solely on her race or ethnicity, nor does UT assign any predetermined or numerical value to a person based on those characteristics. At UT, race is "one factor among many," which the University uses to assemble a diverse student body. Thus, based on the obvious similarities between UT's program and the Supreme Court-approved program in *Grutter*, UT's admissions policy on its face appears to be narrowly tailored.

Despite these similarities, Plaintiffs argue UT's use of race in admissions decisions is not narrowly tailored because: 1) "it produces only minimal gains in the enrollment of under-represented minorities;" 2) UT failed to consider race-neutral alternatives that would achieve UT's diversity goals; 3) UT's consideration of race is over-inclusive because it benefits Hispanic students, who are not underrepresented; and 4) UT's consideration of race has no logical end point. Pls.' Mot. for Part. Summ. J. at 19–30; Pls.' Resp. & Reply at 22–29.

Plaintiffs' first argument attempts to force UT into an impossible catch–22: on the one hand, it is well-established that to be narrowly tailored the means "must be specifically and narrowly framed to accomplish" the compelling state interest, *Shaw v. Hunt*, 517 U.S. 899, 908, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996), but on the other hand, according to the Plaintiffs, the "narrowly tailored" plan must have more than a minimal effect. In support of their argu-

ment, Plaintiffs cite *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007). Plaintiffs are correct that Parents Involved criticizes the "minimal effect" the school's racial classification had on the assignments of students. 127 S.Ct. at 2759–61. However, read in context, this criticism is not meant to establish a new element to the strict scrutiny analysis, but rather is offered as evidence that the school districts had failed to "consider[ ] methods other than explicit racial classifications to achieve their stated goals." *Id.* at 2760. *Parents Involved* reaffirms *Grutter's* standard that "[n]arrow tailoring requires 'serious good faith consideration of workable race-neutral alternatives,'" and criticizes the school districts for rejecting race-neutral alternatives "with little or no consideration." *Id.* (quoting *Grutter*, 539 U.S. at 339, 123 S.Ct. 2325). Thus, as described by the Supreme Court in *Parents Involved*, the question is not whether the means adopted by UT exceeds some undefined "minimal effect" on diversity, but rather whether UT has demonstrated "serious, good faith consideration of workable race-neutral alternatives." [14] *Id.* The undisputed evidence establishes that UT has done more than merely consider race neutral alternatives. The vast majority of UT students are admitted under the Top Ten Percent law, which Plaintiffs agree is a race-neutral policy, and the undisputed evidence establishes UT has instituted several scholarship programs intended to increase the diversity yield from acceptance to enrollment, expanded the quality and quantity of its outreach efforts to high schools in underrepresented areas of the state, and focused additional attention and resources on recruitment in low-performing schools. Orr Aff. ¶ 4. Despite these race-neutral efforts to expand diversity at UT, in 2004 the University determined it still lacked a diverse student body, as evidenced by the absence of African–American and Hispanic students in thousands of its classes. *2004 Proposal* at Table 8. To argue UT has failed to give serious, good faith consideration to race-neutral alternatives is to ignore the facts of this case—namely, that UT has used and continues to use race-neutral alternatives in addition to its limited consideration of race as part of its admissions process.

As the Supreme Court in *Parents Involved* recognized, "The point of the narrow tailoring analysis in which the *Grutter* Court engaged was to ensure that the use of racial classifications was indeed part of a broader assessment of diversity, and not simply an effort to achieve racial balance, which the Court explained would be "patently unconstitutional."" 127 S.Ct. at 2753 (quoting *Grutter*, 539 U.S. at 330, 123 S.Ct. 2325). The facts of *Parents Involved*, as set forth in that case, are clearly distinguishable from this case:

> In the present cases, by contrast, race is not considered as part of a broader effort to achieve "exposure to widely diverse people, cultures, ideas, and viewpoints"; race, for some students, is determinative standing alone ... It is not simply one factor weighed with others

**14.** It should also be noted it is undisputed in the record before the Court that the consideration of race in admissions does increase the level of minority enrollment. The undisputed evidence establishes that even though it is not determinative, race is a meaningful factor and can make a difference in the evaluation of a student's application. Pls.' Mot. for Part. Summ. J. Mem. at 5; Pls.' Mot. for Part. Summ. J. Ex. 8, Dep. of Bruce Walker ("Walker Dep.") at 45:5–12. However, because race is not assigned any numerical value but rather considered as part of an individualized, holistic review of each applicant, the University does not have a specific number of admitted students who were admitted because of their race.

in reaching a decision, as in *Grutter*, it is *the* factor. Like the University of Michigan undergraduate plan struck down in *Gratz*, the plans here "do not provide for a meaningful individualized review of applicants" but instead rely on racial classifications in a "nonindividualized, mechanical" way.

*Id.* at 2753–54 (citations omitted). UT's admissions policy does not make race "*the*" factor nor rely on racial classifications in a "nonindividualized mechanical" way. UT has not only considered but continues to use race-neutral alternatives in addition to its consideration of race. Thus, the mere fact that UT's consideration of race does not have a large effect on diversity, due largely to the overwhelming presence of the Top Ten Percent law, does not mean the policy fails to further UT's compelling interest or is in some way not narrowly tailored for that goal.

These facts also address Plaintiffs' second argument, that "UT Austin failed to undertake 'serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks.'" Pls.' Mot. for Part. Summ. J. at 22 (quoting *Grutter*, 539 U.S. at 339, 123 S.Ct. 2325). As described above, UT not only considered but in fact adopted race-neutral alternatives. However despite these efforts, UT concluded the diversity of its student body was lacking based, at least in part, on the absence of underrepresented minority students in thousands of classes. *2004 Proposal* at Table 8. UT thus determined it was necessary to consider race in admissions in addition to continuing to use those race-neutral alternatives. As *Grutter* indicates, courts should provide some level of deference to a university in determining whether additional diversity is needed. *Grutter*, 539 U.S. at 328, 123 S.Ct. 2325 ("The Law School's educational judgment that such diversity is essential to its educational mission is one to which we defer."). Further-

more, the Supreme Court recognized that the mere existence of race-neutral alternatives, like percentage plans, that could improve diversity does not preclude universities from considering race in admissions, as long as the university has given those alternatives "serious, good faith consideration." *Id.* at 339–40, 123 S.Ct. 2325. "Narrow tailoring does not require exhaustion of every conceivable race-neutral alternative." *Id.* at 339, 123 S.Ct. 2325. The Plaintiffs essentially argue UT must exhaust every conceivable race-neutral alternative before it could consider race, a proposition specifically rejected by the Supreme Court. The Court thus explicitly finds the undisputed record and evidence establishes that UT has given serious, good faith consideration to workable race-neutral alternatives as required by *Grutter*.

Next, Plaintiffs argue UT's consideration of race is not narrowly tailored because it is over-inclusive in that it benefits Hispanic students, who are not underrepresented when compared to Asian–American students. This argument closely resembles the Plaintiffs' argument regarding whether UT has stated a compelling state interest, and fails for the same reason. The undisputed evidence establishes that the percentage of UT students who are Hispanic is less than two-thirds the percentage of Texas' population that is Hispanic. Thus, in that sense, Hispanics are clearly an underrepresented minority group. The Constitution does not prohibit the government from considering demographic information in order to decide which groups are underrepresented. Instead, as *Grutter* indicates, the Constitution prohibits racial balancing and racial quotas, but there is no indication in *Grutter* or any other case cited by the Plaintiffs that universities are constitutionally required to ignore societal demographics. *Grutter*, 539 U.S. at 334–35, 123 S.Ct. 2325.

The Court thus finds UT's intent to increase the enrollment of Hispanic students does not render their consideration of race in admissions unconstitutionally over-inclusive.

Finally, Plaintiffs argue UT's consideration of race in admissions is not narrowly tailored because it has "no logical end point." Pls.' Mot. for Part. Summ. J. at 30. The Plaintiffs are correct that in order to be narrowly tailored, the *Grutter* Court required that "race-conscious admissions policies must be limited in time." 539 U.S. at 342, 123 S.Ct. 2325. However, the Supreme Court also recognized that "[i]n the context of higher education, the durational requirement can be met by sunset provisions in race-conscious admissions policies and periodic reviews to determine whether racial preferences are still necessary to achieve student body diversity." *Id.* The undisputed evidence establishes that every five years UT's admissions process is evaluated specifically to assess whether consideration of race is necessary to the admission and enrollment of a diverse student body, or whether race-neutral alternatives exist that would achieve the same results. Walker Aff. ¶ 16; *2004 Proposal* at 32. The first formal review of UT's use of race in admissions is scheduled to begin in the fall of 2009. *2004 Proposal* at 32. Thus, UT's admissions policy explicitly includes a periodic review to determine whether its consideration of race remains necessary to achieve a diverse student body, as required by *Grutter*.[15]

Accordingly, the Court finds UT's consideration of race in admissions is narrowly tailored. In fact, it would be difficult for UT to construct an admissions policy that more closely resembles the policy approved by the Supreme Court in *Grutter*. Nothing in *Grutter* prohibits a university from using both race-neutral alternatives and race itself, provided such an effort is necessary to achieve the educational benefits that stem from sufficient student body diversity. Such efforts should in fact be encouraged as the next logical step toward the day when consideration of a person's race becomes completely unnecessary. But, until that day, universities are not required to exhaust every possible race-neutral alternative as long as they consider those alternatives seriously and in good faith. UT not only considered several race-neutral alternatives, it implemented them and continues to use them to this day. But, despite those efforts, UT still found diversity lacking in its student body and thus decided to consider race as part of its admissions process. Under *Grutter* and *Parents Involved*, UT's decision and the ensuing admissions policy is narrowly tailored to further a compelling governmental interest.

## CONCLUSION

The Texas Solicitor General summarized this case best when he stated, "If the Plaintiffs are right, *Grutter* is wrong." Absent Texas' Top Ten Percent law and the effect it has on UT admissions, the Court has difficulty imagining an admissions policy that could more closely resemble the Michigan Law School's admissions policy upheld and approved by the Supreme Court in *Grutter*. But if the Plaintiffs are right, and if the Top Ten Percent law somehow acts to make UT's consideration of race in admissions unconstitutional, then every public university in the United States would be prohibited from considering race in their admissions process because the same type of "percentage

---

**15.** The Court further notes that the Supreme Court "[took] the Law School at its word that it would 'like nothing better than to find a race-neutral admissions formula' and will terminate its race-conscious admissions program as soon as practicable." *Grutter*, 539 U.S. at 343, 123 S.Ct. 2325 (citation omitted).

plan" which the Top Ten Percent law embodies could be established at any state university, and thus their failure to implement such a plan would constitute a failure to consider race-neutral alternatives. *Grutter* stands for exactly the opposite, as the decision explicitly permitted the consideration of race despite the existence and availability of race-neutral alternatives like percentage plans or lotteries. 539 U.S. at 340, 123 S.Ct. 2325. Consequently, as long as *Grutter* remains good law, UT's current admissions program remains constitutional.

In accordance with the foregoing:

IT IS ORDERED that LULAC's Motion for Leave to File *Amicus Curiae* Brief In Support of Defendants Out of Time [# 104] is GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Partial Summary Judgment [# 94] is DENIED.

IT IS FURTHER ORDERED that Defendants' Cross–Motion for Summary Judgment [# 96] is GRANTED and the Court GRANTS summary judgment in favor of all Defendants on all claims.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Withdraw Suzzette Rodriguez Hurley as Attorney [# 115] is GRANTED as unopposed.

IT IS FINALLY ORDERED that all pending motions are DISMISSED AS MOOT.

### *JUDGMENT*

BE IT REMEMBERED on the *17th* day of August 2009 the Court entered its order granting summary judgment on behalf of the Defendants, the Court enters the following:

IT IS ORDERED, ADJUDGED, and DECREED that the Court finds the University of Texas at Austin's admissions policy, and specifically its consideration of race as part of the admissions process, to be narrowly tailored to further a compelling government interest and thus constitutional under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, U.S. Const. amend. XIV, § 1, and the federal civil rights statutes, 42 U.S.C. §§ 1981, 1983, and 2000d *et seq.*

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that the Plaintiffs Abigail Fisher and Rachel Michalewicz TAKE NOTHING in this cause against the Defendants the State of Texas; the University of Texas at Austin; Kenneth Shine, Chancellor of the University of Texas System in his official capacity; David B. Pryor, Executive Vice Chancellor for Academic Affairs in his official capacity; Barry D. Burgdorf, Vice Chancellor and General Counsel in his official capacity; William Powers, Jr., President of the University of Texas at Austin in his official capacity; the Board of Regents of the Texas State University System; John W. Barnhill, Jr., H. Scott Caven, Jr., James R. Huffines, Janiece Longoria, Colleen McHugh, Robert B. Rowling, James D. Dannenbaum, Paul Foster, and Printice L. Gary, as Members of the Board of Regents in their official capacities; and Bruce Walker, Vice Provost and Director of Undergraduate Admissions in his official capacity,[1] and that all costs of suit are taxed against the Plaintiffs, for which let execution issue.

---

1. Plaintiffs previously voluntarily dismissed Defendants the State of Texas and Burgdorf, and substituted Kenneth Shine for Mark Yudof. To any extent necessary, this judgment shall also apply to the previously dismissed or substituted defendants.