Justice GINSBURG, dissenting.
 

 The University of Texas at Austin (University) is candid about what it is endeavoring to do: It seeks to achieve student-body diversity through an admissions policy patterned after the Harvard plan referenced as exemplary in Justice Powell's opinion in
 
 Regents of Univ. of Cal. v. Bakke,
 

 438 U.S. 265
 
 , 316-317,
 
 98 S.Ct. 2733
 
 ,
 
 57 L.Ed.2d 750
 
 (1978). The University has steered clear of a quota system
 like the one struck down in
 
 Bakke,
 
 which excluded all nonminority candidates from competition for a fixed number of seats. See
 

 id.,
 

 at 272-275, 315, 319-320
 
 ,
 
 98 S.Ct. 2733
 
 (opinion of Powell, J.). See also
 
 Gratz v. Bollinger,
 

 539 U.S. 244
 
 , 293,
 
 123 S.Ct. 2411
 
 ,
 
 156 L.Ed.2d 257
 
 (2003) (Souter, J., dissenting) ("Justice Powell's opinion in [
 
 Bakke
 
 ] rules out a racial quota or set-aside, in which race is the sole fact of eligibility for certain places in a class."). And, like so many educational institutions across the Nation,
 
 [1]
 
 the University has taken care to follow the
 model approved by the Court in
 
 Grutter v. Bollinger,
 

 539 U.S. 306
 
 ,
 
 123 S.Ct. 2325
 
 ,
 
 156 L.Ed.2d 304
 
 (2003). See
 
 645 F.Supp.2d 587
 
 , 609 (W.D.Tex.2009) ("[T]he parties agree [that the University's] policy was based on the [admissions] policy [upheld in
 
 Grutter
 
 ].").
 

 Petitioner urges that Texas' Top Ten Percent Law and race-blind holistic review of each application achieve significant diversity, so the University must be content with those alternatives. I have said before and reiterate here that only an ostrich could regard the supposedly neutral alternatives as race unconscious. See
 
 Gratz,
 

 539 U.S., at 303-304, n. 10
 
 ,
 
 123 S.Ct. 2411
 
 (dissenting opinion). As Justice Souter observed, the vaunted alternatives suffer from "the disadvantage of deliberate obfuscation."
 

 Id.,
 

 at 297-298
 
 ,
 
 123 S.Ct. 2411
 
 (dissenting opinion).
 

 Texas' percentage plan was adopted with racially segregated neighborhoods and schools front and center stage. See House Research Organization, Bill Analysis, HB 588, pp. 4-5 (Apr. 15, 1997) ("Many regions of the state, school districts, and high schools in Texas are still predominantly composed of people from a single racial or ethnic group. Because of the persistence of this segregation, admitting the top 10 percent of all high schools would provide a diverse population and ensure that a large, well qualified pool of minority students was admitted to Texas universities."). It is race consciousness, not blindness to race, that drives such plans.
 
 [2]
 
 As for holistic review, if universities cannot explicitly
 include race as a factor, many may " resort to camouflage" to "maintain their minority enrollment."
 
 Gratz,
 
 539 U.S., at 304,
 
 123 S.Ct. 2411
 
 (GINSBURG, J., dissenting).
 

 I have several times explained why government actors, including state universities, need not be blind to the lingering effects of "an overtly discriminatory past," the legacy of "centuries of law-sanctioned inequality."
 

 Id.,
 

 at 298
 
 ,
 
 123 S.Ct. 2411
 
 (dissenting opinion). See also
 
 Adarand Constructors, Inc. v. Penã,
 

 515 U.S. 200
 
 , 272-274,
 
 115 S.Ct. 2097
 
 ,
 
 132 L.Ed.2d 158
 
 (1995) (dissenting opinion). Among constitutionally permissible options, I remain convinced, "those that candidly disclose their consideration of race [are] preferable to those that conceal it."
 

 Gratz,
 

 539 U.S., at 305, n. 11
 
 ,
 
 123 S.Ct. 2411
 
 (dissenting opinion).
 

 Accordingly, I would not return this case for a second look. As the thorough opinions below show,
 
 631 F.3d 213
 
 (C.A.5 2011) ;
 
 645 F.Supp.2d 587
 
 , the University's admissions policy flexibly considers race only as a "factor of a factor of a factor of a factor" in the calculus,
 

 id.,
 

 at 608
 
 ; followed a yearlong review through which the University reached the reasonable, good-faith judgment that supposedly race-neutral initiatives were insufficient to achieve, in appropriate measure, the educational benefits of student-body diversity, see
 
 631 F.3d, at 225-226
 
 ; and is subject to periodic review to ensure that the consideration of race remains necessary and proper to achieve the University's educational objectives, see
 

 id.,
 

 at 226
 
 .
 
 [3]
 
 Justice Powell's opinion in
 
 Bakke
 
 and the Court's decision
 in
 
 Grutter
 
 require no further determinations. See
 
 Grutter,
 

 539 U.S., at 333-343
 
 ,
 
 123 S.Ct. 2325
 
 ;
 
 Bakke,
 

 438 U.S., at 315-320
 
 ,
 
 98 S.Ct. 2733
 
 .
 

 The Court rightly declines to cast off the equal protection framework settled in
 
 Grutter
 
 . See
 
 ante,
 
 at 2417. Yet it stops short of reaching the conclusion that framework warrants. Instead, the Court vacates the Court of Appeals' judgment and remands for the Court of Appeals to "assess whether the University has offered sufficient evidence [to] prove that its admissions program is narrowly tailored to obtain the educational benefits of diversity."
 
 Ante,
 
 at 2421. As I see it, the Court of Appeals has already completed that inquiry, and its judgment, trained on this Court's
 
 Bakke
 
 and
 
 Grutter
 
 pathmarkers, merits our approbation.
 
 [4]
 

 For the reasons stated, I would affirm the judgment of the Court of Appeals.
 

 See Brief for Amherst College et al. as
 
 Amici Curiae
 
 33-35; Brief for Association of American Law Schools as
 
 Amicus Curiae
 
 6; Brief for Association of American Medical Colleges et al. as
 
 Amici Curiae
 
 30-32; Brief for Brown University et al. as
 
 Amici Curiae
 
 2-3, 13; Brief for Robert Post et al. as
 
 Amici Curiae
 
 24-27; Brief for Fordham University et al. as
 
 Amici Curiae
 
 5-6; Brief for University of Delaware et al. as
 
 Amici Curiae
 
 16-21.
 

 The notion that Texas' Top Ten Percent Law is race neutral calls to mind Professor Thomas Reed Powell's famous statement: "If you think that you can think about a thing inextricably attached to something else without thinking of the thing which it is attached to, then you have a legal mind." T. Arnold, The Symbols of Government 101 (1935) (internal quotation marks omitted). Only that kind of legal mind could conclude that an admissions plan specifically designed to produce racial diversity is not race conscious.
 

 As the Court said in
 
 Grutter v. Bollinger,
 

 539 U.S. 306
 
 , 339,
 
 123 S.Ct. 2325
 
 ,
 
 156 L.Ed.2d 304
 
 (2003), "[n]arrow tailoring ... require[s] serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks." But,
 
 Grutter
 
 also explained, it does not "require a university to choose between maintaining a reputation for excellence [and] fulfilling a commitment to provide educational opportunities to members of all racial groups."
 

 Ibid.
 

 I do not read the Court to say otherwise. See
 
 ante,
 
 at 2420 (acknowledging that, in determining whether a race-conscious admissions policy satisfies
 
 Grutter
 
 's narrow-tailoring requirement, "a court can take account of a university's experience and expertise in adopting or rejecting certain admissions processes").
 

 Because the University's admissions policy, in my view, is constitutional under
 
 Grutter,
 
 there is no need for the Court in this case "to revisit whether all governmental classifications by race, whether designed to benefit or to burden a historically disadvantaged group, should be subject to the same standard of judicial review." 539 U.S., at 346, n.,
 
 123 S.Ct. 2325
 
 (GINSBURG, J., concurring). See also
 
 Gratz v. Bollinger,
 

 539 U.S. 244
 
 , 301,
 
 123 S.Ct. 2411
 
 ,
 
 156 L.Ed.2d 257
 
 (2003) (GINSBURG, J., dissenting) ("Actions designed to burden groups long denied full citizenship stature are not sensibly ranked with measures taken to hasten the day when entrenched discrimination and its aftereffects have been extirpated.").
 

 * * *